Merlo Builders, Inc., et al. [1] v. Commissioner. Merlo Builders, Inc. v. Commissioner
Docket Nos. 85900, 86384, 86385.
United States Tax Court
T.C. Memo 1964-34; 1964 Tax Ct. Memo LEXIS 304; 23 T.C.M. (CCH) 185; T.C.M. (RIA) 64034; February 12, 1964
*304 Each of three corporations issued notes in the face amount of $150,000 to nonstockholders for $50,000 cash. Held: That under the circumstances of this case, the notes constituted equity capital and not loans. Interest and amortization deductions were properly disallowed. Held, further: That Merlo Builders, Inc., and Vesta Homes, Inc., properly accrued liabilities arising from the purchase of land in the amounts of $30,870 and $30,600, respectively. Harold R. Burnstein and A. M. Fredericks, 111 W. Washington, Chicago, Ill., for the petitioners. Charles B. Wolfe, Jr., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined deficiencies in income taxes of the petitioners in the amounts and for the taxable years as follows: Dkt. No.
Petitioner
Year
Amount
85900
Merlo Builders, Inc.
October 31, 1956
$59,510.78
86384
Vesta Homes, Inc.
November 30, 1956
44,388.29
November 30, 1957
31,952.07
86385
Buena Vista Homes, Inc.
November 30, 1956
9,561.09
November 30, 1957
14,648.14
The cases were consolidated for trial pursuant to agreement of the parties. Certain adjustments *305 have been stipulated by the parties. The issues remaining for determination are: 1. Whether deductions claimed by petitioners in Docket Nos. 85900, 86384 and 86385 as amortization of discount on certain notes payable are allowable, and, if allowable deductions, when are they deductible in the cases of Docket Nos. 86384 and 86385. 2. Whether deductions claimed by petitioners in Docket No. 86384 and 86385 as interest expense on certain notes payable are allowable deductions. 3. Whether certain real estate costs claimed by petitioners in Docket Nos. 85900 and 86384 in the amounts of $30,870 and $30,600, respectively, are allowable as cost of goods sold. In Docket No. 85900, the taxable year ending October 31, 1955, is to be considered since a net operating loss carryover from that year to the taxable year ending October 31, 1956, a deficiency year before the Court, was disallowed in full. The taxable year ended November 30, 1955, is to be considered in both Docket Nos. 86384 and 86385 since a net operating loss carryover from that year to the taxable year ended November 30, 1956, one of the deficiency years properly before us, was disallowed in full in Docket No. 86384 and all *306 but $58 was disallowed in Docket No. 86385. General Findings of Fact The stipulated facts are found accordingly and the stipulation, together with the exhibits therein identified, is included herein by reference. Merlo Builders, Inc. (hereinafter sometimes referred to as Builders), Vesta Homes, Inc. (hereinafter sometimes referred to as Vesta) and Buena Vista Homes, Inc. (hereinafter sometimes referred to as Buena), are corporations organized and existing under the laws of the State of Illinois with their principal office at 14400 South Hoxie Avenue, Burnham, Illinois. Petitioners' books and records and Federal income tax returns were prepared on an accrual basis and their Federal income tax returns for the taxable years here involved were filed with the district director of internal revenue at Chicago, Illinois. All of the issued and outstanding shares of stock of each of the petitioners are in the name of Armand Merlo (hereinafter sometimes referred to as Merlo). Issues 1 and 2. Amortization of Notes Payable, Discount and Interest Deductions Findings of Fact In 1954 Merlo located some vacant land, consisting of 100 vacant lots on the east and west sides of Torrence *307 Avenue, Burnham, Illinois, and decided he would like to go into the home building business for himself. Merlo attempted to borrow money from various savings and loan associations in order to purchase these lots, but none of them would lend money to purchase vacant land. Merlo then went to Harold J. Green (hereinafter sometimes referred to as Green) for financial help. Merlo first became acquainted with Green, an attorney and financier, while working as a construction superintendent for Green's father who was then in the home building business. After Green's father's death in 1953, Merlo worked for David Cooper, who is Green's brother-in-law, for about a year and then quit because they could not get along. Merlo then worked as a general superintendent for another construction firm for about a year. In order to get Green's financial help, Merlo claims he had to make the "deal look real good" to Green. When Green agreed to finance Merlo, Merlo told him to set up a corporation and lend him the money. At this time Merlo's only "assets" were about $2,000 in a savings account and his "160 pounds" of muscle. Green supplied the funds to acquire the land and to finance the start of construction. *308 Merlo followed the advice of Green regarding all corporate matters and it was Green who determined the number of corporations that should be formed. Under Green's guidance, three corporations were formed and they are the petitioners here involved. Their dates of incorporation and the amount of issued and outstanding stock of each are as follows: Issued and Outstanding Stock
Date of
No. of
Amt. Paid in
Corporation
Incorporation
Shares
for Shares
Merlo Builders, Inc.
November 30, 1954
10
$1,000
Vesta Homes, Inc.
November 30, 1954
10
1,000
Buena Vista Homes, Inc.
November 30, 1954
10
1,000
Merlo paid for the issued and outstanding shares as follows: Amount paid
Corporation
for Shares
Date Paid
Merlo Builders, Inc.
$1,000
Dec. 7, 1954
Vesta Homes, Inc.
1,000
Dec. 20, 1956
Buena Vista Homes, Inc.
1,000
Nov. 20, 1955
The minutes of Builders, Vesta and Buena disclose that the first meeting of their respective board of directors took place on November 23, 1954, and that all directors were present. The minutes of each corporation further show that each board of directors, on motion duly made and seconded, *309 unanimously adopted the following resolution: RESOLVED that this corporation, in order to raise capital for its business, shall sell its bonds, notes, debentures, certificates of indebtednesses or other evidences of debt, in either coupon or registered form, in such principal amounts and at such discounts, and at such rates of interest, as the officers of this corporation, in their sole discretion, shall deem necessary. The books and records disclose that Merlo, Gladys Merlo, his wife, and Albert Merlo, his brother, were directors of each of the corporations. However, Merlo's wife and brother never attended any corporate meetings or made any corporate decisions. In fact, Merlo himself very seldom held or attended any corporate meetings. In general, the following would instead occur. Merlo would discuss corporate matters with Green over the telephone and Green would have the corporate minutes prepared and mailed to Merlo for his signature and the signatures of his wife and brother. Builders issued three unsecured promissory notes in the face amount of $50,000 each, dated December 8, 1954, payable to Green. These notes were due two years from their date and bore interest at 2 *310 percent per annum before maturity and 7 percent per annum after maturity. In exchange for these three notes issued in the aggregate face value of $150,000, Builders received $50,000 in cash from Green. Vesta issued three unsecured promissory notes in the face amount of $50,000 each, dated December 8, 1954, two of which were payable to Green and the remaining one payable to Jules R. Green. These notes were due three years from their date and bore interest before maturity at 2 percent per annum and 7 percent per annum after maturity. In exchange for the three notes issued in the aggregate face value of $150,000, Vesta received $50,000 in cash. Jules R. Green is a business partner of Harold J. Green. He did not directly participate in any of the transactions here involved. Buena issued three unsecured promissory notes in the face amount of $50,000 each, dated December 28, 1954, and payable to Green. Said notes were due three years from this date with interest at 2 percent per annum. The notes were to bear interest at the rate of 7 percent per annum after maturity. In exchange for the three notes issued by Buena, in the aggregate face amount of $150,000, said corporation received *311 $50,000 cash. Merlo and Green both recognized that the $50,000 in cash advanced to each of these three corporations was not sufficient for their purposes and that other financing would be necessary to carry out their corporate purposes. Green and Merlo are not related. Green is not a stockholder of record, an officer, or member of the board of directors of any of the petitioners. Green did not at any time have a right or option to buy stock, nor was there any understanding between Merlo and Green that Green would ever acquire stock in any of these companies. Merlo signed all the checks for all these corporations. However, financial statements of the corporations were periodically sent to Green. Of the 100 vacant lots acquired in Burnham, Illinois, 49 lots on the west side of Torrence Avenue were purchased by and for Builders. These lots were available for the immediate building and the sale of homes. The 51 vacant lots on the east side of Torrence Avenue were purchased by Builders for Vesta. Green claimed these lots were clogged with special assessment liens and it took about a year to get the land available for sale. None of the 100 vacant lots were purchased by or for Buena. *312 This latter corporation purchased lots that were not merchantable and on which it took a year or two to clear up the title. Buena was a speculative enterprise and at the time it was organized had no plans to build homes. Green acknowledged it was a speculative enterprise and that the three years due date for its notes was "strictly a guess." Three or four months prior to the due date of their notes, Vesta and Buena received extensions of their maturity dates. Vesta received an extension of 10 years and Buena received an extension of four years. The interest rate did not change at the end of 1957 from 2 percent to 7 percent because the notes were not considered to have matured until they were in default. The Greens anticipated having their profits from these discounted notes taxed at capital gains rates. However, during 1956 or 1957 the Internal Revenue Service indicated to them that gains of the type the Greens anticipated reporting from the notes here involved would not receive, in their opinion, the favorable capital gains treatment. Until the character of the gains from the notes here involved is clarified, neither of the Greens are anxious to receive payment for their notes. *313 This was the reason they were willing to grant extensions of the maturity dates for the unpaid notes of Vesta and Buena. The corporations made loans to Green, Merlo and to organizations owned or controlled by them for little or no interest. For example, on or about February 27, 1958, Buena loaned Donna Green $30,000. Donna is Green's daughter. Also the books and records of Vesta disclose that that corporation loaned Donna $30,000 about the same date. At the trial, Merlo had no recollection of either of the two loans. These loans were repaid within a thirty to ninety day period without interest. Another transaction took place in 1958 indicating use of the corporations for personal benefit to Green. In March of that year Vesta sold certain land in Lansing, Illinois, for the sum of $41,400. The sale price of this land was payable as follows: Cash at time of sale
$13,800
Note due March 17, 1959
13,800
Note due March 17, 1960
13,800
$41,400 The cost of the land to Vesta was $18,903.95 giving a gross profit of $22,496.05. In November of 1958 Vesta exchanged the two notes it received from this land sale in the aggregate face amount of $27,600, for a note from Marion *314 F. Green, wife of Harold J. Green, in the face amount of $16,600. Vesta claimed an $11,000 deduction for its taxable year ended November 30, 1958, as a discount on notes sold. Merlo believed that the buyer would default on his notes and the land would have to be reacquired by Vesta. Merlo relied on the judgment of his auditor, also the auditor for Green, who suggested the exchange of the notes. Green, who handled the transaction, gave as the reason for it that if the land was reacquired by Vesta, it would be taxed to the extent of the face value of the notes. The notes that were acquired by Green's wife were sold just before their maturity at par less a discount of 6 or 8 percent. Builders issued its checks to Green in the amounts of $125,000 and $25,000 on March 3, 1956, and October 5, 1956, respectively, in exchange for its promissory notes. The promissory notes of Vesta and Buena are still outstanding. Each of the three corporations claimed deductions for discount expense of $100,000 resulting from their exchange of $150,000 in notes for cash of $50,000 as follows: Taxable
Corporation
year ended
Amount
Merlo Builders, Inc.
Oct. 31, 1955
$44,758.00
Oct. 31, 1956
55,242.00
Vesta Homes, Inc.
Nov. 30, 1955
30,555.56
Nov. 30, 1956
33,333.36
Nov. 30, 1957
36,111.08
Buena Vista Homes.,
Inc.
Nov. 30, 1955
30,555.56
Nov. 30, 1956
33,333.34
Nov. 30, 1957
36,111.10
*315 Builders accrued on its books and records for 1955 and claimed for Federal income tax purposes interest expense in connection with its notes in the amount of $4,474.49. In addition, Vesta and Buena accrued, paid and claimed interest expense deductions in connection with their notes for the taxable years ended November 30, 1955 through November 30, 1958, as follows: Taxable year
Amount
Amount
Corporation
ended
accrued
paid
Vesta Homes, Inc.
November 30, 1955
$3,000
November 30, 1956
2,750
$3,000
November 30, 1957
3,000
1,000
November 30, 1958
3,000
Buena Vista Homes, Inc.
November 30, 1955
3,000
November 30, 1956
3,000
3,000
November 30, 1957
3,000
November 30, 1958
3,000
The respondent treated the notes as equity capital and disallowed the amortization of the bond discount for all three petitioners and also disallowed interest deductions for two of them, Vesta and Buena. Opinion The first question to be decided is whether there was created between petitioner corporations on the one hand and the Greens on the other, a debtor-creditor relationship. If so, the notes issued by the corporations were genuine evidences *316 of indebtedness and the amounts accrued by the corporations as interest expense and the amortization of discount constituted proper deductions from gross income. If not, respondent's disallowance of these amounts as deductions from the corporations' gross income should be sustained. Our question is a factual one and the petitioners have the burden of establishing a debtor-creditor relationship between themselves and the noteholders. , modified on other grounds, (C.A. 6, 1963). The problem of determining the true nature of advances to business enterprises has arisen frequently in cases involving a socalled thin corporation, wherein the major portion of cash and/or property required to get the business established and under way has been evidenced by corporate notes. , affd. per curiam, (C.A. 2, 1951); *317 (C.A. 9, 1956); , affd. (C.A. 6, 1957), reversed on other grounds, . The authorities, in general, are of little value in the determination of a particular case for the reason that each depends for its solution upon its own peculiar facts to be determined in the light of all the surrounding circumstances. This being true, we think that no good purpose would be served by entering upon a detailed review of the decided cases relating to the instant subject matter. In deciding each of these cases on the basis of its own peculiar facts, the courts have been careful not to lay down any allembracing rule of general application. But such cases have pointed out or suggested various tests or criteria which may be applied in seeking out the realities, among which are the following: Was the capital and credit structure of the new corporation realistic? What was the business purpose, if any, of organizing the new corporation? Were the noteholders the actual promoters and entrepreneurs of the new adventure? Did the noteholders bear the principal risks of loss attendant upon the adventure? *318 Would other investors make such advances? Was there lack of reasonable expectation of repayment and did the noteholders attempt to enforce the obligations? ; , affd. (C.A. 7, 1958). Other factors considered by the courts are the names given the instruments evidencing the indebtedness, the presence or absence of a maturity date, the source of the payments, the right to enforce payment of principal and interest, participation in management, and the ability of the corporation to obtain loans from outside lending institutions. No single factor is determinative. ; , affd. (C.A. 9, 1960). No one characteristic can be said to be decisive in the determination of whether the obligations are risk investments in the corporations or debts. The essential difference between a creditor *319 and an owner is that the latter intends to make an investment and take the risks of the venture so that he may enjoy the chances of profit, while the former seeks a definite obligation, payable in any event. (C.A. 7, 1942), reversing . In the instant case, the instruments in question are in approved legal form, and, if their legal attributes alone were determinative of the character of the interest and amortization deductions, there would be little room for doubt that they were the indebtedness they purport to be. For tax purposes, however, their conformity to legal forms is not conclusive. Although a taxpayer has the right to cast his transactions in such form as he chooses, and the form he chooses will generally be respected, the Government is not required to acquiesce in the taxpayer's election of form as necessarily indicating the character of the transaction upon which his tax is to be determined. ; cf. ; *320 . Under the circumstances, although giving consideration to the form of the notes as a factor to be considered, we turn to the overall facts of the case to determine whether the substance of the transactions which they purport to evidence was in actuality loans or indebtedness and whether the substance of the amounts sought to be deducted is in reality interest and amortization of bond discount. It is respondent's contention that the Green brothers are the owners of the petitioners here involved and that their advances in the form of loans to the petitioners are capital contributions. He argues, therefore, that the claimed deductions for so-called bond discount and interest are not allowable deductions for Federal income tax purposes. In this case it is readily apparent from a review of the facts that the capital structures of the petitioners were unrealistic and grossly inadequate for carrying on the business for which each was organized and in which each engaged. At all times material, Vesta and Buena had issued and outstanding capital stock of only $1,000 and Builders had, in addition to only $1,000 of issued and outstanding *321 capital stock, a paid-in surplus of $5,000. Approximately one month after these corporations were organized, they each went through the form of borrowing $50,000 in cash from the Greens and each delivered to the Greens therefor its promissory notes in the aggregate face amount of $150,000. It should be noted, in addition, that in the case of Vesta, the $1,000 of capital was not paid into the corporation until December 20, 1956, and in the case of Buena the $1,000 of capital was not paid into it until November 20, 1955. Thus, in the case of Vesta, it presumably engaged in business for more than two years without any paid-in capital funds and in the case of Buena for more than a year without any such funds. Not only is the ratio of claimed debt to claimed risk capital of these corporations unrealistic, but it is clear that the funds provided in the form of risk capital were inadequate to accomplish their corporate purpose. Both Merlo and Green recognized and admitted that even the $50,000 in cash advanced to each of these corporations was insufficient for their purposes and other financing was necessary to carry out their corporate purposes. Other factors further established that *322 these advances were risk capital. The funds claimed to have been loaned could not have been borrowed from any other source. The notes issued were unsecured. In the case of Vesta and Buena, when the original maturity date passed in December 1957, no attempt was made to enforce payment of these notes. They were merely extended and remained unpaid at the time of trial and will remain unpaid, according to Green, until the taxable character of the profit from the discounted notes is determined. The advances were not made to a going business but for the purpose of getting a business started. Petitioners argue that as long as a corporation deals with nonshareholders, the legal form of corporate transactions are to be given effect and will control the tax consequences. They further stress that it is only in the case of corporation-shareholder transactions which are not at arm'slength, that the courts may examine the transaction to determine the true nature and tax consequence of the act. In addition, they take the position that in the absence of a hybrid security, the argument that high ratio of debt to equity capital and the fact that the creditor took a risk thereby turning the debt to *323 equity, can be applied to shareholder debt, but not to nonshareholder debt. We have no doubt that a corporation may provide for its finances either by equity capital or by a debt, so long as the latter can be said to be debt in terms of substantial economic reality. Nevertheless, the practice of disregarding the form of a transaction for tax purposes is based on the long standing and oft recognized principle that substance will prevail over form in determining the effect of transactions for Federal income tax purposes, and that this principle is applicable to transactions between unrelated as well as related parties. Cf. ; (C.A. 2, 1959), affirming ; . We experience no difficulty in disregarding the form of transactions involving corporations and nonshareholders when the form employed was not in accord with the substance. It is commonly accepted *324 that we cannot achieve consistency in taxation by a slavish adherence to common law and local statutory law treatment of legal instrumentalities and their determination as to the legal consequences of transactions. To do so would create discrimination and inequality among taxpayers similarly situated as an economic matter, based on differences that are not warranted by the pattern and design of the Code. If we fail to consider the motives of the parties, their economic position, the over-all effects of the transactions, all adjudged in the light of the pattern, purpose, and language of the Code, arbitrary and capricious results will obtain. In the light of the whole record before us which we have carefully considered, petitioners have failed to establish that the notes in question represent creditor interests. Accordingly, the claimed deductions for interest and bond discount are not allowable deductions for Federal income tax purposes. Having decided the claimed amounts for interest and bond discount are not allowable deductions, we need not consider the question as to when they would be deductible if allowed. Issue 3. Real Estate Costs Finding of Fact During the 1920's *325 and the 1930's certain improvements were made in the village of Burnham that were financed by issuing to the contractor special assessment bonds. As of 1954, some of these special assessment bonds had not been paid and the holders of said bonds asked the village of Burnham to hold a special assessment sale. When a public sale of special assessment liens is held and the lien purchased on a lot, a purchaser can then foreclose in his own name rather than going through the state attorney's office and through the municipality for payment of the special assessment bond. The lien sale gives the bondholder an additional remedy to enforce collection of the money due on the bonds. The village of Burnham planned to hold a special assessment lien sale in November or December of 1954. Attorney Robert Biederman represented a group who owned a major portion of the special assessment bonds that were in default. Green also owned certain special assessment bonds of the village of Burnham that were in default. Merlo had discussed with Biederman the possibility of acquiring certain vacant lots in Burnham *326 from a client of Biederman's. Merlo and Biederman agreed to a cash price of $1,500 a lot. Merlo brought Green to a meeting at Burnham with Biederman, and Green stated that for cash he would want a 10 percent discount, bringing the price down to $1,350 per lot. When Biederman and his client learned that Green also owned assessment bonds, an agreement was reached whereby 100 vacant lots were to be sold to Green for a lesser price for Green's so-called cooperation at the special assessment lien sale held by the village of Burnham. Green "cooperated" by becoming a part of the Biederman group in the bidding at the lien sale rather than an independent bidder. On September 22, 1954, Biederman acknowledged their discussion by sending the following letter to Green: Dear Harold This is to confirm our discussion relative to the pending Sale & Assignment of delinquent Special Assessment Liens in the Village of Burnham. I represent bondholders who own a great majority of outstanding Burnham Special assessment bonds. Relying on the recent Waukegan case they would prefer an arrangement whereby they would make nominal bids at the lien sale and subsequently surrender their bonds to the Village. *327 My clients are the owners of approximately 100 lots in Burnham that Shorty Merlo is willing to purchase for $1,350 - each, on a cash deal if he can raise the money. He has indicated he would pay $2,000 - apiece if we give him terms so as to allow him to pay for the lots as he uses them. Realizing you too own Burnham bonds, my clients have authorized me to offer these lots to you for the sum of $750 - each, cash, if you will cooperate with them relative to the pending lien sale and their intent as set forth in the second paragraph of this letter. Very truly yours, (signed) Bob Biederman Green told Biederman to prepare the deeds to the 100 vacant lots in blank and when the deal was to be closed, Green would supply the name of the grantee. When Biederman arrived at Green's office to close the real estate deal, Green told Biederman the grantee was to be Merlo Builders, Inc. Builders paid Biederman the following amounts for the deeds to the 100 vacant lots. Date
Amount
December 7, 1954
$26,280.00
December 7, 1954
18,183.75
December 25, 1954
9,000.00
The payments of $26,280 and $9,000 by Builders were for the 49 lots on the west side of Torrence Avenue. *328 The payment of $18,183.75 by Builders was for the 51 lots on the east side of Torrence Avenue. Builders acquired the 51 lots on the east side of Torrence Avenue for Vesta. There was no written agreement between Green and Builders or between Green and Vesta that said corporations were to acquire these lots at $1,350 per lot. There was, however, a verbal agreement between Merlo and Green that Green was to receive $1,350 per lot. Merlo was aware at the time this agreement was reached that Green paid somewhat less than that amount per lot. The agreement further provided that the lots were to be free and clear of all defects in title. Under date of January 4, 1955, Green sent a letter to Vesta which reads, in part, as follows: Gentlemen: The Village of Burnham, Illinois, has sold, on November 5, 1954, to Robert G. Tessar, the lien of the unpaid special assessments on the following described lots, which you own: Lots, 18, 19, 25 to 35, both inclusive, and 39, in Block 1; Lots 31 to 33, both inclusive, and 37 to 40, both inclusive, in Block 2; Lots 4 to 17, both inclusive, in Block 3; Lots 5 to 7, both inclusive, and 24 to 30, both inclusive, in Block 4; and Lots 24 to 28, both *329 inclusive, in Block 6; in Torrence Ave. Addn. to Burnham, A subn. of the SW-1/4 of Sec. 6, Twp. 36 N.R 15, East of the 3rd P.M. in CCI. Jules and I have purchased special assessment liens from the Village of Burnham on other lots in which neither you nor any of our other clients are interested. Mr. Tessar now proposes that we exchange with him our liens for his liens on your lots. If we do not accept his proposition, he can bid against you on the tax foreclosure sale which may result in your losing these lots unless you bid higher than he does at the tax sale. I have a hunch that this lien sale may be set aside, but if it is not, your 51 lots are encumbered for about $50,000.00 of principal, interest, forfeitures, etc., which you may have to pay in full. I should like you to think over the following proposition. I will make the exchange of the special assessment liens with Robert G. Tessar, and will sell you the liens on your lots for $600.00 each, or $30,600.00. Title to the liens will not pass to you until the Chicago Title & Trust Co. will guarantee that it will waive them on your opinion of title. You will not be under any legal obligation to pay for these liens until you *330 receive the Chicago Title & Trust Co.'s guarantee of good title. If the sale of the liens by the Village of Burnham is set aside or declared invalid, or if the Chicago Title & Trust Co., for any reason, will not guarantee the discharge of these liens from your property, you can return the assignments of lien to me and you will not owe us any money at all. I think this is a fair deal, since you run absolutely no risk at all. If you agree, kindly acknowledge your consent on the lower left hand side of a copy of this letter and return it to me. * * *
When Merlo received this letter he did not understand it and called Green. He asked Green if there was to be an increase in the agreed upon price of $1,350 per lot and Green stated no, the price was to remain the same as agreed upon originally. Merlo, relying upon Green, signed the letter and mailed it back to Green. For its taxable years ended October 31, 1955 and 1956, Builders deducted, as part of the cost of goods sold, $6,300 and $24,570, respectively, as additional costs of the real estate sold during those years. This additional amount of $30,870 has not been paid and is shown as a liability on the books and records of Builders. *331 Vesta deducted, as part of the cost of goods sold, $15,600 and $15,000 for its taxable years ended November 30, 1956 and 1957, respectively, as additional costs of real estate sold in those years. This additional amount has not been paid and, on the books and records of Vesta, the $30,600 is shown as a liability. Both Builders and Vesta were on an accrual method of accounting for all periods here material. The respondent has disallowed as part of the cost of goods sold the foregoing claimed additional amounts. Opinion Respondent contends that the issue here involved concerns itself with another attempt by Green to siphon off more of the earnings and profits of petitioners through the means of sales of real estate to these corporations at prices which are not bona fide. Respondent has allowed as cost of land purchased by Builders and Vesta the cash paid out at the time of acquisition but has denied as a cost of the land purchased the liability set up on the books of Builders for $30,870 and on the books of Vesta for $30,600. There is a presumption of correctness attached to respondent's determinations and the burden rests with petitioners to show error. Petitioners, on the *332 other hand, allege that a liability arose out of the purchase of the 100 lots in question, and that a case for the existence of such liability, reflected in accrual to cost of land, has been established by them. We agree with petitioners' position and accordingly allow the items in question as additional (accrued) costs of land. Prior to the time it was learned that Green held special assessment bonds on property in Burnham, a price was established at $1,350 per lot. After the Biederman group learned that Green could upset their plan to make only nominal bids for the liens, they were willing to sell the 100 lots here involved for approximately $750 apiece. This was agreed to by Green and the deeds were delivered in exchange for two checks written on Builders in the amount of $35,280 in payment for the 49 lots on the west side of Torrence Avenue. A third check for $18,183.75 was made in payment for the 51 lots on the east side. Biederman thus was paid $720 per lot for the property on the west side and approximately $357 per lot for the property on the east side of Torrence Avenue. There is no evidence that Builders and Vesta made any further payments to obtain these lots. The *333 record discloses, however, that Builders and Vesta are indebted to Green for accrued additional costs of lots in the respective amounts of $30,870 and $30,600, which are the amounts here in dispute. For some reason, not clearly apparent from the record, the amount of cash to be paid by Vesta appears to have been reduced, but the accrued liability remained the same. Although it is true that there was no written agreement between Green and Builders, or Green and Vesta, that said corporations were to acquire these lots at amounts greater than the amounts paid Biederman, the record clearly shows that the corporations would have had to pay a higher price had Green not been in a position to "cooperate" with the Biederman group; and that the corporations were willing to pay the higher price and were not concerned with the bargain Green was able to make because of his holding special assessment bonds. There is also uncontradicted evidence of the value of the real estate as of the time of purchase. Norman O. Brezizinski, a realtor, testified that the property was worth about $45 a foot. Since the lots are 40-foot lots, that would make them worth about $1,800 each. Biederman testified *334 that the land was worth around $40 to $50 a front foot. This would make a 40-foot lot worth between $1,600 and $2,000. Green testified that the lots were worth about $1,600 apiece except for the corner lots, which are 60-foot lots and they would be worth about $2,400. Merlo stated that he would have been willing to pay up to $1,500 a lot. Respondent has offered no evidence to the contrary. We, of course, have given careful consideration to the fact that the accrued liabilities under discussion have not as yet been paid. This, of itself, however, does not establish want of bona fides. We conclude, after detailed examination of the entire record as applicable to this issue, that petitioners have established by a preponderance of the evidence that the amounts involved represent bona fide accrued real estate costs and are allowable additions to the costs of goods sold. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Vesta Homes, Inc., Docket No. 86384, and Buena Vista Homes, Inc., Docket No. 86385.↩